RENDERED: APRIL 2, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0606-MR

SHARON GINTER
and JOHN GINTER                                                    APPELLANTS


v.         APPEAL FROM FLEMING CIRCUIT COURT
           HONORABLE STOCKTON WOOD, JUDGE
           ACTION NO. 19-CI-00077


STEVEN ANTHONY COX
and MIRANDA ALLISON COX                                            APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE: GOODWINE, KRAMER, AND MAZE, JUDGES.

KRAMER, JUDGE: Appellants John and Sharon Ginter are respectively the

stepfather and mother of appellee, Steven Cox; and they are the grandparents of

Steven's two adopted sons, D.C. (age 9) and P.C. (age 7). [1] Beginning in January 2019, Steven decided to prohibit John and Sharon from visiting with D.C. and P.C. Consequently, John and Sharon petitioned the Fleming Circuit Court for grandparent visitation rights regarding D.C. and P.C. pursuant to KRS[2] 405.021. After the parties presented their positions and evidence in support thereof at a hearing, the circuit court ultimately entered a final judgment denying John's and Sharon's petition. This appeal followed. Upon review, we affirm.

For the sake of context, we will discuss the applicable legal framework before delving into the facts. As indicated, the overarching issue in this matter involves the right of grandparents to visit with their grandchildren against the wishes of the grandchildren's parents. In the seminal case of *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), the United States Supreme Court considered grandparent visitation and the federal constitutional implications of state statutes that permit courts to grant non-parent visitation with children over the objections of their parents. The Court noted that the Due Process Clause of the Fourteenth Amendment gives parents a fundamental liberty interest in the care, custody, and control of their children. *Id.*, 530 U.S. at 66, 120 S. Ct. at

---

[1] Miranda Allison Cox is Steven's ex-wife and the adoptive mother of D.C. She has no parental rights regarding P.C., who currently has no legal mother. As her status as an appellee tends to indicate, Miranda does not contest the circuit court's disposition of this matter.

[2] Kentucky Revised Statute.

2060.  Further, the Court recognized "a presumption that fit parents act in the best interests of their children[,]" and as such,

> so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.

*Id.* at 68-69, 120 S. Ct. at 2061 (citing *Reno v. Flores*, 507 U.S. 292, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993)).

In *Walker v. Blair*, 382 S.W.3d 862 (Ky. 2012), our Supreme Court discussed the impact of *Troxel* on Kentucky's grandparent visitation statute, KRS 405.021(1), which states in pertinent part, "The Circuit Court may grant reasonable visitation rights to either the paternal or maternal grandparents of a child and issue any necessary orders to enforce the decree if it determines that it is in the best interest of the child to do so."  The *Walker* Court upheld the constitutionality of the statute, but emphasized that for the statute to comport with *Troxel*, courts must presume that a fit parent acts in his or her child's best interest:

> When considering a petition for grandparent visitation, the court must presume that a fit parent is making decisions that are in the child's best interest.  "[T]he Due Process Clause does not permit a [s]tate to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made."  So long as a parent is fit, "there will normally be no reason for the [s]tate to inject itself into the private realm of the family to further

-3-

question the ability of that parent to make the best decisions concerning the rearing of that parent's children." So a fit parent's wishes are not just a factor to consider in determining what is in the child's best interest. The constitutional presumption that a fit parent acts in the child's best interest is the starting point for a trial court's analysis under KRS 405.021(1).

*Walker*, 382 S.W.3d at 870-71 (footnotes omitted).

Essentially, in a grandparent visitation dispute, a parent and grandparent are not on equal footing, and a parent's decision to deny visitation is given special weight. Furthermore, the *Walker* Court explained that because a fit parent is presumed to act in the best interest of the child, a grandparent seeking visitation against a parent's wishes must overcome the presumption by clear and convincing evidence. Thus, for a court to grant visitation over the wishes of the parents, the grandparents must establish compelling evidence, that is, clear and convincing, that visitation is in the child's best interest. *Id*. at 871. In other words, the grandparent must show that "the fit parent is clearly mistaken in the belief that grandparent visitation is not in the child's best interest. If the grandparent fails to present such evidence to the court, then parental opposition alone is sufficient to deny the grandparent visitation." *Id*. "Given that these cases involve the fundamental right of parents to raise their children as they see fit without undue interference from the state, the use of the [clear and convincing] heightened

-4-

standard of proof is required." *Vibbert v. Vibbert*, 144 S.W.3d 292, 295 (Ky. App. 2004).

While "best interest" is a broad term, the *Walker* Court adopted a nonexclusive list of factors, which initially were delineated by this Court in *Vibbert*, for a trial court to consider when grandparent visitation is sought. Those factors are:

> 1) the nature and stability of the relationship between the child and the grandparent seeking visitation;
>
> 2) the amount of time the grandparent and child spent together;
>
> 3) the potential detriments and benefits to the child from granting visitation;
>
> 4) the effect granting visitation would have on the child's relationship with the parents;
>
> 5) the physical and emotional health of all the adults involved, parents and grandparents alike;
>
> 6) the stability of the child's living and schooling arrangements; and
>
> 7) the wishes and preferences of the child.

*Walker*, 382 S.W.3d at 871. Moreover, *Walker* added an additional factor: "the motivation of the adults participating in the grandparent visitation proceedings." *Id*.

Chief among these factors is a consideration of the effect that granting non-parent visitation would have on the child's relationship with his parents. In *Troxel*, the Court noted that "[t]he extension of statutory rights in this area to persons other than a child's parents . . . comes with an obvious cost. For example, the [s]tate's recognition of an independent third-party interest in a child can place a substantial burden on the traditional parent-child relationship." *Id*., 530 U.S. at 64, 120 S. Ct. at 2059. The Kentucky Supreme Court has recognized that this reasoning is especially true where animosity exists between the parent and grandparent. *Walker*, 382 S.W.3d at 872. "Grandparent visitation should not be granted if it is clearly detrimental to the parent-child relationship." *Id*. In *Grayson v. Grayson*, 319 S.W.3d 426 (Ky. App. 2010), a trial court granted limited grandparent visitation over the vehement objection of the parents. The paternal grandmother therein had exhibited extreme vitriol toward her daughter-in-law and, perhaps to a lesser degree, toward her son. In reversing the decision of the trial court, this Court held,

> [T]he state of discord prevailing here is far more than a
> "trivial disagreement" and exceeds the bounds of a
> "family quarrel of little significance." Requiring a child
> to have visitation with a grandparent who has extreme
> animosity toward the child's parent would be inherently
> unhealthy for the child and would potentially undermine
> the relationship between the child and its parent. . . .
> We respect the views of the distinguished trial court. If
> this case were governed by an abuse of discretion
> standard, we might be inclined to uphold the judgment of

very limited visitation between Appellee and her grandchildren. We discern an endeavor by the trial court to preserve a thread in the torn fabric of this family. But this was not a discretionary ruling by the trial court. The court was required to apply KRS 405.021 and determine whether visitation was affirmatively proven by clear and convincing evidence to be in the children's best interest. Applying this standard, we can reach no conclusion other than that the trial court erred as a matter of law in its conclusions and judgment upon the evidence.

*Id*. at 432 (quoting *King v. King*, 828 S.W.2d 630 (Ky. 1992), *overruled by Walker*, 382 S.W.3d at 870).

The Court in *Walker* further answered the question as to whether clear and convincing proof of a loving relationship between a grandparent and grandchild alone is enough to overcome the parental presumption:

Except in special circumstances, it is not enough. . . . If the only proof that a grandparent can present is that they spent time with the child and attended holidays and special occasions, this alone cannot overcome the presumption that the parent is acting in the child's best interest. The grandparent must show something more— that the grandparent and child shared such a close bond that to sever contact would cause distress to the child. Again, these determinations are fact-intensive. To allow visitation on a lesser showing would put fit grandparents on equal footing as fit parents, which violates the Due Process Clause.

*Walker*, 382 S.W.3d at 872 (footnote omitted); *see also Goodlett v. Brittain*, 544 S.W.3d 656, 662 (Ky. App. 2018) (explaining that in making this determination, "the mere existence of a close relationship between the grandparents and the

children, or the fact that the children lived in the grandparents' home for a time, will not always be sufficient to overcome the parental presumption." (Citation omitted.)).

With that said, we now turn to the case at hand. When Steven decided to prohibit John and Sharon from visiting with D.C. and P.C. in January 2019, it was several months after Sharon had accused him of allowing the "women in [his] life to drag [him] around by the penis." Her comment was overheard by Steven's wife, Brandis, who became upset; and when Steven repeatedly asked Sharon to apologize for the comment over the course of the following months, Sharon repeatedly refused. What prompted Sharon's comment was a text Sharon had received from Steven's ex-wife, Miranda, complaining about plans Steven had made to remove D.C. and P.C. from their current school district, and to instead place them in the school district where Steven's current wife, Brandis, was employed as a teacher, and where Brandis's children (*e.g.*, D.C.'s and P.C.'s step-siblings) were enrolled.

In the fall of 2018, Sharon's continued refusal to apologize for her comment culminated into an argument between herself, John, Steven, and Brandis at Steven's and Brandis's home. In sum, Steven accused Sharon of disrespecting Brandis and not having "his back" in his relations with his ex-wife. Sharon reiterated her refusal to apologize for her earlier comment and further accused

Brandis of being a liar. John chastised Steven for yelling and for what he perceived as Steven's disrespect for Sharon. John and Sharon abruptly left afterward. And, evidently, their argument was loud enough to cause one of Brandis's children to take D.C. and P.C. to another room in the house, shut the door, and raise the volume on a television set to drown out the sound of it. There is no indication D.C. and P.C. overheard the specifics of the argument. But, according to the testimony of the Friend of the Court, both D.C. and P.C. nevertheless heard the sound of the argument and, thereafter, understood they were no longer seeing Sharon and John because, in their words, "Nanna said something that hurt Daddy."

As indicated, after Steven later prohibited Sharon and John from visiting D.C. and P.C., Sharon and John sought to override his wishes by suing him in Fleming Circuit Court for visitation rights. Both sides of this dispute later provided evidence and testimony on this subject at a hearing before a domestic relations commissioner (DRC) of the Fleming Circuit Court. And, considering that evidence, the DRC made the following recommended findings relevant to *Walker*, *supra*:

> **A. The nature and stability of the relationship between the children and the grandparents seeking visitation**: By all testimony the children were close and bonded to the grandparents. They saw the grandparents on a very regular basis. There was no testimony from Steven that the children's and the grandparents'

relationship was not good – only that *his* relationship with his mother was not good.

**B.  The amount of time the grandparent and children spent together**:  Although there is some discrepancy between the Petitioners and Steven as to the amount of time the children spent with the Petitioners, it was still apparent that the children had spent a great deal of time with the Petitioners.

**C.  The potential detriments and benefits to the children from granting visitation**:  The DRC did not hear any testimony of a detriment to the children continuing their relationship with the grandparents. Steven claimed that his mother was toxic and that he needed to get away from her (and thus wanted the children away from her), but his actual testimony only describes a difference in what he believes she should be commenting upon and what she actually comments on. Granted Sharon used some terminology that most persons would find offensive and she has continued to refuse to apologize.  However, this only affects her relationship with her son and his new wife – it should not affect her relationship with the children as it was not said to them nor is there any testimony that they heard this statement. There are obvious benefits for continuing the grandparent relationship and the relationship as described was normal and healthy.  Even Steven in his text message to John acknowledged that it was not fair to the children to be without their grandparents and that the children should be in Petitioners' lives.

**D.  The effect granting visitation would have on the children's relationship with the parents**:  As long as Steven does not chastise his children for seeing their grandparents (and there is no testimony that would lead to that conclusion), there should be no effect on his relationship with the boys other than a loss of available time to spend with them (which is always the case in any visitation by another with a child).

**E.  The physical and emotional health of all the adults involved, parents and grandparents alike**:  There was some testimony of Sharon having a health issue in summer of 2018, but nothing that would interfere with her ability to care for the children during any visitations. The DRC believes that Sharon and Steven have both acted immaturely in the situation.  A simple apology from Sharon would likely have prevented this entire Court proceedings.  Steven withholding the children, because he is upset with his mother, is equally immature.

**F.  The stability of the children's living and schooling arrangements**:  Any visitations by the Petitioners will not affect the children's living arrangements or schooling.

**G.  The wishes and preferences of the children**:  Per the Friend of the Court the children desire to see their grandparents.  The fact that D.C. snuck a text to his grandmother on her birthday is equally telling that he misses the relationship.

**H.  The motivation of the adults participating in the grandparent visitation proceedings**:  It appears that Steven's motivation is to control the parenting of the children without the input into his decisions by his mother.  It appears that the Petitioners' motivation is to continue a loving close bond with their grandchildren.  It does not appear that either side in the proceeding is being malicious or inappropriate.

In light of its findings, the DRC's recommendation was for the circuit court to grant Sharon and John visitation rights, which it further specified in detail. Subsequently, Steven filed a bill of exceptions and contested the DRC's recommendations.  And, after further considering this matter, the circuit court entered an order on December 16, 2019, denying Sharon's and John's petition.

To summarize, the circuit court agreed after reviewing the evidence that it "appears that feelings got hurt and needed apologies, from both sides, never materialized only leading to a fostering of hard feelings." However, the circuit court emphasized that Steven was a legally fit parent – a determination no party disputes – and as such he was entitled to the presumption that his decision to deny visitation to John and Sharon was consistent with his children's best interests. *See Walker*, 382 S.W.3d at 870-71. Accordingly, as the circuit court correctly determined, the dispositive issue was whether Sharon and John – who bore the burden of proof and risk of non-persuasion in this matter – had rebutted that presumption through clear and convincing evidence. In that respect, the circuit court held in relevant part as follows:

**I. Findings of Fact**

. . .

3. . . . There was no testimony by the Friend of the Court that the children were unduly harmed by having no contact with their grandparents. According to the Friend of the Court, the children wished to see their grandparents. The Court agrees with the Friend of the Court and the DRC that visitation would be better if it did occur; however, the Petitioner[s] ha[ve] not met [their] heavy burden of showing by substantial evidence that the minor children are severely affected by the withdrawal of grandparent visitation by Respondent. The Court believes "[T]he state of discord prevailing here is far more than a 'trivial quarrel of little significance,'"[FN] where the grandmother was openly critical of Father and

-12-

Stepmother in the presence of the children, and especially when grandmother has refused to apologize.

> [FN] <u>Grayson v. Grayson</u>, 319 S.W.3d 426, 432 (Ky. App. 2010); *citing* <u>King v. King</u>, 828 S.W.2d 630 (Ky. 1992).

4. This Court believes that the family quarrel in the present case is not as offensive as in the <u>Grayson</u> case. This Court agrees with the DRC that the relationship between the parties will mend over time. The Court also believes that the comment made by grandparent to the parent was not proper, but not so egregious or outrageous to completely break off the minor children's relationship with their grandmother. The Court also believes that the argument between grandparent and parent that occurred late last year was inappropriate to occur in front of the minor children. However, with no apology forthcoming from grandmother, the father's authority and respect is undermined in the eyes of the children.

. . .

**III. Judgment**

. . .

2. The Court finds that because the Respondent Father is a fit parent, this Court will not order him to send the minor children for visitation with their paternal grandparents at this time.

3. The Court directs that if substantial evidence is presented to the Court that the Respondent Father's refusal to allow grandparent visitation shows substantial mental or emotional harm to the minor children, this Court will revisit this issue.

4. The Court orders that the Respondent Father, Respondent's wife, and Petitioners shall negotiate and

determine under which circumstance and conditions that parties may agree that grandparents are permitted to have contact with the minor children. Such conditions would have to include, at a minimum, a sincere acknowledgement and apology to the father and children that open criticism and ridicule of Father was inappropriate.

As the final paragraphs of what is set forth above tend to indicate, the circuit court, in its wise discernment, intended for the December 16, 2019 order to remain non-final to permit Sharon and John to either adduce evidence supporting that Steven's "refusal to allow grandparent visitation shows substantial mental or emotional harm to the minor children," or to privately negotiate a resolution to this matter with Steven, prefaced with a "sincere acknowledgement and apology to the father and children that open criticism and ridicule of Father was inappropriate." Rather than doing so, however, Sharon and John filed a motion for the circuit court to make its order final and appealable. On April 14, 2020, the circuit court granted their motion, for the following reasons:

The Court requested the parties meet and if no agreement could be reached, the parties were to appear in front of Judge Wood. The Court has been advised that the parties could not agree on a meeting place; the relationships have deteriorated; there has been no movement toward a reconciliation; the Petitioners/grandparents do not wish to attempt a settlement conference; and that Petitioners/grandparents wish to make the Court's ruling in its December 16, 2019 order final and appealable.

Due to the inability of the parties to agree on anything, and due to Petitioners not being willing to participate in a

-14-

settlement conference, the Court hereby designates its December 16, 2019 order to be final and appealable, with no just cause for delay.

This appeal followed. In their brief before this Court, Sharon and John re-emphasize paragraphs "A" through "H" of the DRC's findings, set forth above, and assert those findings demonstrate they adduced substantial evidence in support of their petition for visitations rights. Furthermore, they point out that the DRC believed their evidence justified granting their petition. With respect to their latter point, however, the DRC's beliefs or conclusions based upon the evidence are entitled to no weight whatsoever. *See Eiland v. Ferrell*, 937 S.W.2d 713, 716 (Ky. 1997) (explaining a circuit court has "the broadest possible discretion with respect to the use it makes of reports" or recommendations of a DRC." (Citations omitted)).

And regarding their former point, it makes little difference whether they did or did not *adduce* substantial evidence below; that has little bearing upon our standard for reviewing this appeal. Because Sharon and John were unsuccessful below, the applicable criterion is whether the circuit court's findings were manifestly *against* the weight of the evidence. *See Frances v. Frances*, 266 S.W.3d 754, 756 (Ky. 2008). To explain, a trial court's factual findings are reviewed for clear error. *Reichle v. Reichle*, 719 S.W.2d 442, 444 (Ky. 1986); CR[3]

[3] Kentucky Rule of Civil Procedure.

52.01.  A finding supported by substantial evidence is not clearly erroneous.

*Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003).  Substantial evidence is that

which is "sufficient to induce conviction in the mind of a reasonable person."

*Rearden v. Rearden*, 296 S.W.3d 438, 441 (Ky. App. 2009).  Moreover, we must

give due regard to the family court's opportunity "to judge the credibility of the

witnesses."  CR 52.01.  On the other hand, statutory interpretation and application

of the appropriate standard to the facts are issues of law and, consequently, are

reviewed *de novo*.  *Hill v. Thompson*, 297 S.W.3d 892, 895 (Ky. App. 2009).

This, in turn, leads to Sharon's and John's final argument, and the

primary thrust of their appeal.  They do not contest the circuit court's assessment

that no evidence was adduced which demonstrated Steven's refusal to allow them

visitation of D.C. and P.C. resulted in "substantial mental or emotional harm to the

minor children."  But, they contend that *no such evidence was necessary*.

Sharon and John are incorrect.  As discussed, the *chief* factor to be

considered in deciding a petition for non-parent visitation rights is the effect that

granting such rights would have upon the child's relationship with his parents.

*Troxel*, 530 U.S. at 64, 120 S.Ct. at 2059.  Here, Sharon and John do not contest

their relationship with Steven is currently acrimonious; indeed, from all indications

of the record, Sharon *still* has not apologized to Steven.  Moreover, Sharon and

John do not dispute the circuit court's determination in its December 16, 2019

-16-

order—with which this Court fully agrees – that "with no apology forthcoming from grandmother, [Steven's] authority and respect is undermined in the eyes of the children."

In light of that, and also in light of Steven's undisputed fitness as a parent, Sharon and John were thus required to present more than evidence merely demonstrating "they spent time with [D.C. and P.C.] and attended holidays and special occasions," *Walker*, 382 S.W.3d at 872; or that they had "a close relationship" or lived with D.C. and P.C. for a time. *See Goodlett*, 544 S.W.3d at 662. To properly oppose Steven's fundamental liberty interest in the care, custody, and control of his children, their quantum of proof required them to demonstrate "something more—that [they] shared such a close bond [with D.C. and P.C.] that to sever contact would cause distress to the child[ren]." *Walker*, 382 S.W.3d at 872. And, taken objectively, the circuit court paraphrased this principle when it denied Sharon's and John's petition based upon the dearth of evidence indicating Sharon's and John's lack of visitation had resulted in "substantial mental or emotional harm to the minor children."

Absent any evidence that D.C. and P.C. have suffered distress from Sharon's and John's lack of visitation – and Sharon and John cite none – the circuit court's denial of their petition cannot be considered manifestly against the weight of the evidence or otherwise incorrect. Accordingly, we AFFIRM.

ALL CONCUR.

BRIEF FOR APPELLANTS:

Earl Rogers III
Morehead, Kentucky

BRIEF FOR APPELLEE, STEVEN
ANTHONY COX:

Darrell K. Ruark
Flemingsburg, Kentucky

BRIEF FOR APPELLEE, MIRANDA
ALLISON COX:

No brief filed.